No. 19,360.

MEMORIAL TRUSTS, INC. *v.* SAM N. BEERY, COMMISSIONER, ETC.

(356 P. [2d] 884)

Decided November 14, 1960.

Messrs. ROTHGERBER, APPEL & POWERS, Mr. WILLIAM P. JOHNSON, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN W. PATTERSON, Assistant, Mr. ROBERT G. PIERCE, Assistant, for defendant in error.

Messrs. TULL, HAYS & THOMPSON, Amici Curiae.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

PLAINTIFF in error, Memorial Trusts, Inc., to whom we will refer as Memorial, commenced this declaratory judgment action against defendant in error, hereinafter referred to as the commissioner. The complaint sought a decree invalidating, upon constitutional grounds, C.R.S. 1953, 72-17-1 et seq., and an adjudication that a rule adopted by the commissioner purporting to regulate the business of Memorial is of no legal force or effect.

The commissioner joined in the prayer for declaratory judgment; alleged that the statute was constitutional and that the regulation was a valid exercise of rule-making power by the commissioner conferred upon him

by statute. He further sought an injunction and "liquidation" against Memorial under the provisions of C.R.S. 1953, 72-17-6.

The trial court held the statute to be constitutional; upheld the regulation in dispute; found that Memorial had been violating the act and granted the injunctive relief prayed for by the commissioner.

For a full comprehension of the questions presented by the record in this case, one should read the statute in its entirety (C.R.S. 1953, 72-17-1 to 7). Generally it deals with the subject of prearranged funerals or so-called "Burial Insurance." Pertinent provisions of the act to which we direct attention are the following:

"The insurance department of the state of Colorado may supervise, examine and audit the funds derived by any person, partnership, association, company or corporation, either residing in or doing business within this state, from prepaid or prearranged funeral arrangements or contracts * * *.

" * * * All funds received from contracts or arrangements covered by this article shall be invested, until properly expendable, in securities or trust companies approved by the insurance department.

\* \* \*

" * * * Any and all funds received and invested as stipulated in this article, shall be as a trust and shall not be liable to attachment * * * to pay any debt or liability of the person * * * or corporation issuing such * * * contract.

"The insurance commissioner may promulgate such rules and regulations as may be necessary for the enforcement of the provisions of this article."

Section 6 of the act generally provides for the granting of injunctive relief against those who do not obey the statute, and for "liquidation" of assets. Violation of the act is made a misdemeanor and is punishable by fine or imprisonment, or both.

The commissioner, on July 28, 1958, placed in effect a

regulation which was given the form of "Bulletin No. 30" as follows:

"TO: ALL MORTUARIES HOLDING PREPAID OR PREARRANGED FUNERAL CONTRACTS OR ARRANGEMENTS

"FROM: SAM N. BEERY, Commissioner of Insurance

"WHEREAS, It has come to the attention of the Department of Insurance that certain irregularities are being proposed if not actually practiced in the handling of funds received from prepaid or prearranged funeral contracts or arrangements and

"WHEREAS, Article 17, Chapter 72 CRS 1953, provides that the funds derived from contracts or arrangements may be supervised by this office and

"WHEREAS, The aforesaid laws refer to such funds being a trust and

"WHEREAS, 72-17-4, CRS 1953, provides that the Insurance Commissioner may promulgate such rules and regulations as may be necessary for the enforcement of the said Article 17, Chapter 72, CRS 1953, and

"WHEREAS, The Insurance Commissioner does believe the following regulations are needed in order to help accomplish the purposes enunciated by the laws aforesaid;

"NOW THEREFORE, it is hereby ordered:

"1. That *all* moneys received for prepaid or prearranged funeral arrangements or contracts be placed in trust for the benefit of contract holders and held separate from all other assets until the funeral contemplated has been performed, or refund has been made *in full* of all moneys thus received.

"2. That a representative copy of all such contracts or arrangements, at all times, be kept available at the mortuary's regularly established place of business for inspection by the Insurance Commissioner or his duly authorized representative.

"3. That a representative copy of all trust instruments affecting such funds, at all times be kept available

at the mortuary's established place of business for inspection by the Insurance Commissioner or his duly authorized representative.

"4. That trust assets received from such arrangements or contracts may be invested only in the type securities referred to in Chapter 72, CRS 1953, relating to investments of domestic insurance companies.

"5. That upon complaint of any interested person, and which is not answered to the satisfaction of the Commissioner of Insurance within thirty days of the date of mailing of notice thereof to such mortuary, an independent auditor may be forthwith dispatched, the cost of which will be paid by the mortuary as provided by law.

"6. That semi-annual reports are hereby required on forms prescribed by the Commissioner of Insurance in compliance with 72-17-5, CRS 1953, and must reflect all transactions as of June 30 and December 31 of each year and must be received by this office not later than thirty days after such dates. If there is nothing to report under any space provided by such reports, the word 'none' must be placed therein.

"7. That failure to comply with any of the requirements herein will be treated as a complaint received by an interested party."

There is no disagreement in the evidence. It appears without dispute that Memorial is engaged in the business of entering into written agreements with various residents of Colorado, by which Memorial promises to arrange for Moore Mortuary in Denver to provide a casket selected by the contract purchaser and services incident to funerals, as set forth in the written contract. For the specified merchandise and specified services, the contract purchaser agrees to pay a certain price, not subject to escalation. The contract provides that 25 per cent of the purchase price is to be retained by Memorial as compensation for its sales, collection and administrative expenses. After the first 25 per cent of the purchase price

is paid by the purchaser, the remaining 75 per cent is put in an irrevocable trust in the First National Bank of Denver, to be paid out by the Bank only upon termination of the contract by virtue of the contract purchaser's death, or other termination at purchaser's option.

The evidence shows that selling, collection and administrative expense, including premiums for credit life insurance on the lives of most of the purchasers of contracts, cost approximately 25% of the purchase price. The 75% in trust is invested by the First National Bank of Denver, pursuant to the provisions of the Prudent Man Investment Statute.

Uncontroverted evidence of a qualified accountant and a qualified actuary, as well as the Trust Officer of the First National Bank of Denver, demonstrated that as a result of the investment of the irrevocable trust and normal rates of return thereon (the return goes to Memorial as provided in the contract) with normal death rates calculated according to accepted actuarial means, there is adequate guarantee that all merchandise and services promised by Memorial to the contract purchaser will be delivered and performed. The uncontroverted evidence, as well as the express provisions of the contract, and the trust indenture shows that such trust funds are beyond the reach of anyone but the trustee except to provide the contracted services or to make a refund under the terms of the contract. Additional safeguards provided the contract purchaser, as set forth in the contract, are that if at the time of death the promised services and merchandise cannot be rendered or delivered, the *entire* purchase price is to be refunded to the personal representative of the deceased contract purchaser; e.g., if the family of the contract purchaser desires that the services be performed by a mortuary other than Moore Mortuary, or if the death of the contract purchaser occurs in a distant city and the family does not wish to return the remains to Denver.

The commissioner testified in justification of his Bulle-

tin No. 30 that the Insurance Department, " * * * should avail themselves of the law and should probably either *expand on or clarify* for the purpose of the industry *what we believed the intent of the law was.* * * * "

That portion of the statute which the commissioner attempted to "expand on or clarify" by promulgation of Bulletin No. 30, reads as follows:

"All funds received from contracts * * * shall be invested, until properly expendable, in securities or trust companies approved by the insurance department."

The commissioner, by a regulation adopted by him alone, "expanded" upon the language of the statute to require that all funds received from contracts shall be placed in trust "until the funeral contemplated has been performed or refund has been made in full of all moneys thus received."

Counsel for Memorial set forth numerous grounds for reversal of the judgment, among which we find the following:

"I. C.R.S. 1953, 72-17, violates Article II, Section 25 of the Constitution of Colorado and the due process clause of the Fourteenth Amendment to the Constitution of the United States in that it is vague and lacking in definiteness and imposes penal and criminal sanctions without constitutionally sufficient guides and standards.

"A. C.R.S. 1953, 72-17, is unconstitutionally vague and indefinite by use of the key qualifying phrase 'until properly expendable' without legislative guide or standard as to what expenditures are or are not proper and as to when expenditures are or are. not proper."

Question to be Determined.

 *Where a statute purporting to regulate the sale of prepaid funeral benefits provides that all funds received from contracts covered by the act 'shall be invested, until properly expendable, in securities or trust companies approved by the insurance department; and violations of the act are made punishable by fine or imprisonment and the administrator of the act is auth-*

*orized to seek injunction against offenders continuing in business, and to "liquidate" the assets of such offenders; will such statutory provision be upheld against the objection that it is vague and indefinite and furnishes no legislative standards as to what expenditures are proper and gives no notice of the particular acts which may subject an offender to fine, imprisonment or other penal sanctions?*

The question is answered in the negative. In *Flank Oil Co. v. Tennessee Gas Transmission Co.*, 141 Colo. 554, 349 P. (d) 1005, this court cited with approval from 62 Harvard Law Review 77. At page 78 of that volume we find the following which adequately states the contention of Memorial:

" * * * To the extent that a statute places a penalty upon completed acts, concepts of fairness require that it be sufficiently definite to give notice as to what conduct is necessary to avoid those penalties. Thus, any statute which subjects those who violate its terms to criminal prosecution or to an action for damages must give such notice. Even a statute subjecting violators merely to injunction or to deprivation of a prospective gain should give notice where the secondary effect of such a sanction is to destroy the value of an existing investment of time or money."

The test to which the statute in question must be subjected under this record is made clear by the Supreme Court of the United States in the case of *Connally v. General Construction Co.*, 269 U. S. 385, 46 S. Ct. 126, 70 L. Ed. 322. From the opinion in that case we quote the following:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act

in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. International Harvester Co. v. Kentucky, 234 U. S. 216, 221; Collins v. Kentucky, 234 U. S. 634, 638."

The rule announced in the above quotation is applicable to statutes imposing civil liabilities as well as those which define criminal offenses. *Cline v. Frink Dairy Co.*, 274 U.S. 445, 47 S. Ct. 681, 71 L. Ed. 1146; *B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 45 S. Ct. 295, 69 L. Ed. 589; *Parks v. Libbey-Owens-Ford Glass Co.*, 360 Ill. 130, 195 N. E. 616.

The regulation adopted by the commission is a nullity. The statute in the particulars hereinabove mentioned is violative of due process and is unconstitutional. The judgment accordingly is reversed.

MR. JUSTICE DOYLE not participating.